panel. Honored to be sitting with Judge Barksdale and Judge Prado. We have three cases for argument this morning. Most likely we'll hear the arguments in two and then we may take a short break before we hear the third one. Rules are straightforward and I know you're familiar with them. When the green light's on, you have a full run. You get the yellow or amber light if there is some second point or other points you want to make, it's sometimes good to shift gears and go there. The premium admonition when the red light comes on, please stop. But the main purpose of oral argument is really to assist us so if the court is asking you questions by all means, finish answering the questions. And please stay in the microphones. We record the proceedings for a multiple of benefits and if you get away from the mic, it's hard for the tape to pick up. With that, we'll call the first case, 14-41414, Bosque. Mr. Schmidt. May it please the court. Thank you, Your Honors. In this First Amendment employment retaliation case, I'm going to focus on the issue of causation because that's what the plaintiff makes their decision on and what I think is most contested in this case. The standard for causation in these cases under Mt. Healthy is that a plaintiff must show that their speech on a matter of public concern was a substantial or a motivating factor in their adverse employment action. And then, yes, sir. Concerning the proof, and of course rarely do we have direct evidence, that's why we have that three part test, I understand that the following persons denied having reported to the commissioner that some complaints had been made about him of a whistleblower type, Hammond, Morales, Montalvo, but I didn't see anything in the briefs about whether Judge Lopez or the district attorney had denied advising the commissioner about that. And since it isn't mentioned, I assume neither side perhaps wanted that known, but were Judge Lopez and the DA deposed? Your Honor, they were not deposed in this case. So you elected not to depose them? We did not depose them. So you just sort of laid behind the log? I tried to depose as many as I felt I could depose. I did not depose the judge. I spoke with the district attorney. He was reluctant to be deposed. I'm sorry, that's not on the record. So it was your election not to depose the judge. That's true. Not to depose the district attorney. That is absolutely true, Your Honor. So we don't know whether they told the commissioner or not. We don't know. But don't you have the burden? We do have the burden, and I think we've proven that burden by multiple, multiple things, if I may, Your Honor. First of all, on the people who spoke, who the plaintiffs spoke with, and I presented you a chart which has some, helps explain it a little bit further. But the people who the plaintiffs spoke out to, Del Bosque spoke out to Supervisor Morales. He spoke out to the Judge Lopez. He spoke out to the district attorney. He spoke out to HR Director Montalvo, and he also spoke out to Assistant Hammond. He spoke out to all five of those individuals about the commissioner's use of Coliche, having the county workers pave his driveway, having the county workers pave the driveway of his political supporters. He spoke out to all of those individuals. All of those individuals spoke with the commissioner about either the use of Coliche in the district attorney's investigation and the issues that were going on. All of those individuals, or not, I apologize, not all of them. Some of them spoke about the misuse of Coliche. Some of those individuals counseled the commissioners, worked with the commissioner directly on the reduction in force. I thought we had people that said they had not talked to the commissioner. The people who have spoken with the commissioner, there is evidence, some of them deny that they spoke with the commissioner, but the people who spoke with the commissioner, there's absolute evidence that Anita Hammond, for example, worked with the commissioner on the reduction in force. There's absolute evidence that HR Director Montalvo worked with the commissioner on the reduction in force and signed the termination letters. There's absolute evidence that the district attorney himself spoke with the commissioner about the investigation before they were terminated. There's also absolute evidence that Supervisor Morales spoke with the commissioner about the investigation, about the DA investigation, and one telling point on this point is that the commissioner himself denied that he ever spoke with Supervisor Morales before the plaintiffs were terminated. He denied that he ever met with him once, but the commissioner's assistant, Hammond, said that Mr. Morales was in his office on a daily basis meeting with him behind closed doors. Wait. Morales said he spoke with the commissioner about the DA's investigation. I'm sorry, Your Honor. I believe that the evidence about Morales speaking with the commissioner on the DA's investigation came from Anita Hammond, the commissioner's assistant. She said that she saw them come in. He asked, why are you here to be speaking with the commissioner? He said, I'm talking with him about this investigation. He goes in and speaks with the commissioner. Again, this is before the plaintiffs were terminated. The commissioner swore he never spoke once with Morales, but the commissioner is telling him. Wait. The commissioner swore in his deposition that he never spoke with Morales. Yes, sir. Never. And that's directly controverted by his assistant, Anita Hammond's testimony. He said they spoke daily behind closed doors. But how do we know it's about the investigation? Well, Mr. Morales told Ms. Hammond, I'm speaking with him about this investigation. Ms. Hammond, that would be what we'd call hearsay. It is a hearsay, perhaps maybe an admission against a party opponent, but in this case, it's not controverted. I mean, how is it an admission against a party opponent? Well, I don't want to, I apologize. It is evidence that they did not object to, as hearsay, and I think it is evidence that controverts the commissioner's statement, that he never met with him. And it is evidence that also ties the commissioner to knowledge. I mean, Mr. Del Bosque spoke with Mr. Morales about this. Mr. Gonzales also spoke with Mr. Morales about the misuse of Colice and paving their driveway. And so I think that is, there's a direct connection to the commissioner. I want to point out that in Click versus Copeland, in that case, the decision maker also swore he had no knowledge whatsoever of the protected activity. But the court, this court, held that the evidence of the disputed motivations for the termination, or the demotion in that case, made for fodder for the jury. And in this case, in addition to the close connections that we've got between the speech of the plaintiffs, we've got multiple, multiple other evidence, compelling evidence, I submit, that at least raise a fact issue on the issue of causation and was their speech a motivating factor. The first type of evidence that we've got is that the reasons that the commissioner offered for the termination of the plaintiffs, we presented evidence that those reasons are not true. They offered a broad, general reason that there was a budget deficit, and that's why we had to terminate all of our employees, rehire only some of them. The budget documents from the case... There were 44 employees? I'm sorry, there were 44 employees. And how many were rehired? All but eight employees were rehired. And of those eight, how many are... Three are plaintiffs in this case. One other was also one who had to pave the commissioner's driveway with Colice. He's not a plaintiff in this case, but he was deposed. So the county budget documents show... The general excuse was we had a budget deficit. The county budget documents, whichever version you look at, show that there was a surplus every month leading up to the termination. So that was directly contested, that there was a budget deficit. The chairman, who'd been with the county for 19 years, swore that there was no reason to terminate the plaintiffs because of a budget deficit. There was no reason. Within two months after terminating the plaintiffs, the county started hiring new workers, and within six months had hired three additional workers. Three out of the 11. Three out of the 11, yes, Your Honor. So they rehired. That's correct. So they hired three more workers after they terminated eight workers. But again, there was no budget deficit, and this was... I'm sorry. They terminated three plaintiffs plus, I believe, eight other workers. So 11 workers total. I apologize. But they did hire three additional workers within the months after the plaintiffs were terminated. There was a monthly budget surplus. I think in the month of... I can get into the details, but in the month leading up, there was 10,000... Slow down. Slow down, counsel. I'm so sorry, Your Honor. What struck me was the arguably... I don't want to be pejorative. I don't want to overstate this, but the commissioner's deposition testimony is so questionable. For example, where he initially said, in contradiction to an interrogatory answer by the defendants, that no, the plaintiff Del Bosque wasn't terminated because he had assaulted someone. Then later, he can't even say why Del Bosque was terminated, basically saying there was no reason to terminate him. I mean, there's apparently inconsistency after inconsistency in the commissioner's testimony, which is really glaring. And yet, as I understand it, the district judge, in reading her opinion, refused to take that into consideration in finding there were genuine disputes of material fact. So give us some examples of other cases by our court where we've said a defendant's arguably false testimony is a factor that deserves considerable weight in deciding there is a genuine dispute of material fact. Yes, Your Honor. I mentioned Click v. Copeland. In that case, they looked at the disputed reasons for the termination and said that can show a motivating factor. Haverda v. Hayes County is, I think, very strong on this point. And it says, summary judgment evidence should not be considered in a vacuum. You should consider the defendant's reasons for motivation . . . I'm talking about what is arguably false testimony by a defendant. Yes. That's a consideration, isn't it? Absolutely, it is a consideration. The judge refused to consider that. That's exactly right, Your Honor. And there are . . . we've said we should consider that false testimony. Well, I believe Haverda says that. Haverda says you're supposed to consider indirect evidence, circumstantial evidence, contradictions in what the defense is using as the reasons for the termination. I believe also that in Brady v. . . I'm blanking on the Brady case, but in one of the Brady cases, Brady v. Fort Bend County, I believe, the court there also looked at the contradictory reasons that were given for the demotion in that case. They said they demoted him because of poor performance. The plaintiff said, no, we had good performance, and they gave that record. I'm thinking of something from the record. I think this is correct, that the commissioner said he arrived at his home and saw this Isle of Caliche, but could not explain why it was there, nor did he ever bother to ask. That's exactly right, Your Honor. He said, I don't know where it came from. I didn't ask. I asked, well, do you get Caliche delivered to your house frequently? He's like, no. Well, didn't you want to ask where it came from? No. And ultimately, he then changed his answer in a deposition saying that Caliche . . . and I asked him repeatedly. He then, in a correction to the deposition, said it came from some construction company, I believe, and I never was given the opportunity to explain, and I just gave him multiple chances to explain. He corrected his deposition in writing, as I recall. That's exactly right. Do you have direct evidence that, in fact, the Caliche was applied to his driveway? Yes, we do, Your Honor. Both Mr. Cano, who is one of our plaintiffs, and, again, a very reluctant witness, Mr. Tomes, testified they delivered the Caliche. They got on a tractor, went to the county cemetery, delivered it to the commissioner's home. The commissioner came and watched them as they delivered and spread the Caliche on his property. He told one of the . . . Mr. Cano, good job, and now why don't you go over to Cuco Alaniz's house and put some on his driveway? My question is, do you have a photograph of the Caliche spread on his lawn or any direct evidence of that? We don't have, at that time, a photograph of it. There was, in the DA investigation, there are photographs of the house . . . Is that in the record in this case? And that is in the record in this case. We have the commissioner's circle where he found the Caliche on his driveway, and that is in the record in this case. But do you have a photograph of it after it was applied? I don't want to mislead you or mistake. There is a photograph of the commissioner's driveway that appears to have Caliche on it, and that was looked at by the DA. I don't know how close in time that photograph was taken to when the plane was . . . When I was at Fort Hood a century or so ago, I recall the Caliche dust, but it was a very fine dust that was a constant problem. Is this Caliche more of a durable substance? What is it? I believe it is actually more of a durable . . . It's like a rock-like . . . I believe it is a rock-like substance that they spread with a grater on the driveways, and it's used to pave driveways, to pave roads, that kind of thing, in the valley, in the Rio Grande Valley. Could you give us some authority or some sort of guidance to the court between what we have here is no direct evidence that the county commissioner was aware that these employees had complained about what was going on, no direct evidence of that, versus circumstantial evidence that would logically say, well, but people around him, surrounding him, were told, and it's logical that they would, in turn, tell him. So you have these two competing issues. How is the court to determine which way to go? Well, I think, actually, the jury would be the one to consider, to determine which way to go, because the plaintiff is given evidence of multiple, multiple issues where the commissioner has not told the truth, and where a jury could disbelieve the commissioner that he didn't know. We've got five individuals who are essentially in his inner circle who knew that the plaintiffs were speaking out, and I think that there is abundant circumstantial evidence to show that the commissioner is not telling the truth. Again, statements about, I didn't use the caliche, statements about I didn't promote anybody to take over Mr. Del Bosque's place, he did clearly do that, statements that the budget had a deficit. I've never had a case, Your Honors, where the defendant said, I don't know why I terminated the plaintiff. Is the DA, did he ever finish his investigation before he was not reelected? No, he did not. After he lost his election, the current DA then said that the case was still under investigation and would not release the DA report. We finally got it through the assistance of an open records request through the Texas Attorney General's office is how we got the report. They had a procedural error and were able to get it that way, but they claimed up until they didn't release it, that it was an ongoing investigation. All right. Thank you, Mr. Smith. Thank you, Your Honors. We'll have you open and reserve some rebuttal time. All right. We'll hear from the county. Ms. Leeds. May it please the court. Counsel. Ms. Leeds, I was struck by a comment in your brief at pages 2-3 where you said the prior commissioner who had died and was succeeded by, how do you pronounce the commissioner's name, Sáenz? Sáenz. Sáenz. Sáenz. You said the previous commissioner, Commissioner Gonzalez, quote, had ruled precinct four for about 20 years, close quote, had ruled. Of course, you don't cite any evidence for that. So what's the implication of that? Why are you telling us that? He had basically been there for 20 years, was well-known in the community, came and went, did things, and possibly this whole issue with the San Ysidro Caliche was pursuant to his order and his request. That's the implication I was making with that comment. All right. Thank you. The issue in this case, I believe, is not so much that Commissioner Sáenz may have stated some inconsistencies in his record. It's whether or not Commissioner Sáenz ever heard. You know he stated inconsistencies. You know that, don't you? Oh, yes. Yes. So why shouldn't we consider that in deciding whether there's a genuine dispute of material fact when the primary, only sole individual defendant is stating inconsistencies, if not lying in his deposition? Because the people that supposedly told him about the speaking out, the protected speech, deny ever having heard it. Anita Hammond, who is his secretary, was never told by Del Morales about misuse of county property. Mr. Montalvo, who was also deposed, said he was never told about misuse of county property. The Supervisor Morales said he never heard of this statement of misuse of county property. So if they never heard the speech, they could not go on to say, and Tamez, who was part of supposedly the group that put this caliche on Commissioner Sáenz's driveway, also said, and he was in the, along with the plaintiff and their inner group, he never heard any of this protected speech. So the people that supposedly The plaintiff, the plaintiffs say they told all of them about it. So we've got a genuine dispute of material fact about what they were told. Correct. In that regard. But then not only does the plaintiff have to show that the Commissioner was told or knew about the speech, but that that motivated these, this layoff. And if we go by the timeline of his secretary, he was starting to think about the layoff. No, not that it motivated the layoff, that they were among the three that were laid off. And the reason they were laid off was because they were whistleblowers about this Commissioner. Yes, the protected speech. Only one of them had a whistleblower claim, actual whistleblower claim. Well, I'm using that for short form. Yes. So it's not that he laid off 11 workers. The question is, why did he lay off these three among the 11? Especially in the light of his deposition testimony, where he changed an interrogatory answer and then says there was no reason, he can't remember why he laid off Del Bosque and there was no, and that he was not incompetent. That, correct, that he was not incompetent. Right. He didn't, he could not point to any specifics. He couldn't even remember. He could not remember anything about anything. Pretty much, that's the way it went. Right. However, the plaintiff still hasn't carried their burden to show that Commissioner Sines knew about the protected speech. Well, isn't that for, wouldn't that be better for a jury to decide? Well. Isn't that a genuine dispute of material fact? We don't have direct evidence. You never do in one of these cases. Correct. But there's got to be some kind of circumstantial evidence that shows that the people that the plaintiffs told would have told the Commissioner or did tell the Commissioner. Well, for example, Hammond says Morales met every day with the Commissioner. The Commissioner says, I never met with Morales. I mean, there are just so many inconsistencies in this record that it's startling. But that does, that is, to use Judge Alvarez's words, is somewhat immaterial to the issue of whether or not Commissioner Sines knew about the protected speech. And if you look at the timeline of when these things had to have happened, the San Ysidro issue, which is the big issue that they all complained about at the beginning, that they were all concerned about the San Ysidro poor because it was so big in this public restaurant. That didn't even occur until January. That poor, that caliche that was laid there, didn't even get laid until January. The DA didn't start his investigation until February 21st. These people received their letters, their termination letters, on March 19th. So for them to be reporting wrongdoing in San Ysidro, they had to have done it, and Del Bosque says it was after the DA started his investigation. So it had to have been after February 21st. So all of the things that plaintiffs' claims occurred, Cano meeting with them multiple times, Morales meeting with them multiple times, them spreading the word about the San Ysidro issue and him laying caliche on his own property, all those things had to have happened within the span of two weeks. And then for the whistleblower issue, you would have to also believe then that the district attorney went and told the commissioner about this investigation that really was, you know, being handled completely separately. And there just isn't anything that connects the plaintiff's speech with commissioner's knowledge and the actions before the new year. And the San Ysidro issue hadn't even occurred. He might have started thinking we need to reduce the workforce. Correct. What is the date on which he decided that the three plaintiffs would be terminated? What's the date of that? When did he make the decision, these three are among the 11 that are going to be terminated? He does not know. He just they were And he never could explain how the caliche got in his yard to be put on his driveway. Well, he's had caliche there forever. This new poor, he said a construction company gave it to him. But even there Not a construction company that did business with the county? No, I don't believe so. Because apparently, down in Starr County, TxDOT and other construction companies, when they dig up the caliche, they go and they give it to the county. So the county goes and gives it to whoever asked for it. But he couldn't remember asking for it. He could not remember asking for it. He couldn't explain how it got there. Correct. When he was in a deposition, then he conveniently came up with a reason after he read his deposition and figured he better change it. Well, and therein, either there was a pour of caliche in his, you know, in the front of his property, or did they spread it? I mean, right there, the plaintiffs don't have it right either. Because either it was poured in just a lump in front of his property, or they spread it like the plaintiffs are claiming they did. We're not talking about a bushel basket of caliche, are we? No. A substantial amount of caliche. It's a dump truck full. Yes. Yes. And it would require a grater or some kind of heavy equipment to spread. Because the caliche you saw in Fort Hood is pretty much the same stuff that's down there. It can be very finely ground, but it's also, it doesn't get muddy. And that's one of the reasons they use it. Because it supports water. But, you know, historically, there's been a real problem with county supervisors paving people, paving constituents' driveways, et cetera. That's an ongoing problem. And for him to arrive home and see a dump load truck of caliche in his front yard, you would have thought he would have taken more action than what he says in his deposition. I never did find out where it came from. That would be a logical question, unless he knew. And that would be a logical question, which would give credence to there being a genuine dispute of material fact. But the district judge refused to consider his inconsistent, if not false, testimony. Because it didn't go to the issue of knowledge of the speech. It goes to these other ancillary issues. And that's why she said that those other issues were immaterial to the issue of whether or not the speech was made to these individuals and whether these individuals communicated that speech to the commissioner. And then you have to take the other leap of whether the speech that was communicated to the commissioner, if that was the substantial or motivating factor that led him to put these three among the 11 that were eventually terminated. I want to acknowledge that at the heart of it is a panoply of credibility issues here. Who do you believe? Who you don't believe? Plaintiffs don't have to put on a perfect case to get to trial, so to say that something's immaterial when you have acknowledged inconsistencies is a bit troubling given that if this was a full trial and they lost, they lost. But, I mean, it's at the early stages. It strikes me in the time it took to brief this case, come up here and argue and all this. Y'all could have had the trial by now. Not with a handful of witnesses, people been deposed, could have had the trial, put the depositions in, cross-examine, let somebody decide and be over. But, you know, that's what keeps us in business. But I'm just saying, by the time you get through saying what somebody didn't know, why they didn't know it, they could be on the stand, put on their old ass and somebody figure it out and move down the road. How many witnesses total were involved with this, roughly? How many depositions were taken? I believe six or seven were total. And part of the problem is not one person, whether they were, you know, testifying on behalf of the plaintiffs or not. Not one person corroborated that the plaintiffs had spoken out to them, that they had complained about the misuse of county resources. Not one. They could be lying, right? Yes, they could. But Secretary Hammond, Mr. Tamez, who was one of their group, who said that he was paving the commissioner's driveway, said they'd never said anything to him about misuse of county resources. And that is, I think, what the judge focused on is there was... County employees who depend on that job for their livelihood rarely tell the commissioner you're engaged in misuse of county property. Correct. They would not usually tell him to his face. But they would tell somebody, even if it's a co-worker, and it was those co-workers who said they never heard it. And that... But again, we have testimony that they were told. By the plaintiffs. That's the only testimony we have. Of the people that were supposedly told, not a one. Not a one. When we draw inferences in favor of the non-movement, this isn't on cross motions for summary judgment. You're the movement. Correct. And we draw inferences in favor of the non-movement, the three plaintiffs. Correct. And that's what the district court did. I mean, they... You wouldn't consider the troublesome, to put it mildly, testimony by this commissioner. Well, she looked at the fact that... I mean, plaintiffs were talking about whether he was made into a foreman or not. Is that really relevant to the issue? Whether or not, you know, his statement was, no reason or I don't know, after having answered the question of why did you release these people, was because of budgetary constraints. Plaintiffs put the spin on the budget argument that there were budget excesses, but if you look at the end of the 2011 budget year, there were $30,000 in the red, and they had to move $122,000 into the line item of other salaries to just meet that item. And the plaintiffs argued that the 400 and some thousand was actually what was budgeted. That's incorrect. There was 300 and some budgeted, but they spent 400 and some because they had too many employees. He found all this out as soon as he took office and started trying to do something about it. Ms. Hammond was arguing or stating that she didn't think that you needed to lay people off, but she's not the one that reports to the commissioner's court when he overspends what the court allotted to him, the commissioner is. Whether or not the commissioner knew that David Morales had had disciplinary issues, is that relevant to the fact of did he receive any kind of suggestion even that the plaintiffs were making this protected speech? And the question there is no, he did not. He learned about the Sunny Sea that were issued the same time Ms. Hammond did and the same time Morales did because he heard that something was going on in Sunny Sea. This is, of course, after it happened in January or early February. At pages 5 through 6 of your red brief, you're talking about the specific instances of claimed you have the mesquite logs for, I don't know who those are for, and you have the commissioner's driveway, but you don't include these political supporters, these two other persons where it's claimed they poured the caliche dust. Why isn't that in your brief? Well, because I didn't, the testimony was that these individuals, and they make mention of it in one place, these individuals are important in the community and the question was would you like their support in an election? Yes. The rest of the testimony as to whether or not these people were his political supporters is nil. So to characterize them as his political supporters was a spin. If they're just private residents in the county, they shouldn't be getting the county property, should they? They don't give this stuff away. This county does that. It just gives it, it gives away and pours and uses county employees and county employees at the edge of the road and then the person has to spread it themselves. But yes, they give it away. Well, isn't there testimony that the county employees spread the material at these two political supporters of the commissioner? The plaintiffs do testify that they poured it and spread it at these places, but those probably aren't the only ones. Because there was testimony by Mr. Morales that they would pour it and spread it if there were elderly people or people that needed an ambulance to go in and out of their property or for, if they were covering up a septic tank or a septic hole, something like that, the county would do this. But otherwise, they would not, but they do give the culture away. In this instance, however, they did make Lane's Restaurant pay for it after it was discovered what they had used up. Thank you very much and I would ask that you refer to the district court. All right. Thank you, Ms. Leeds. Mr. Smith, back to you. Yes, sir. Thank you, your honors. In the case, the district court itself acknowledged that this evidence suggests that the commissioner is untruthful and I want to just point out in addition to some of the evidence we've talked about, defense just mentioned about the timeline. The timeline here is essentially anywhere from a month to two months between when the Coliche was poured and when the plaintiffs started speaking out. She gave the dates of February 21st when the district attorney investigation happened and then they were terminated approximately a month later on March 19th. So there's a month timeline period. And in Mooney v. Lafayette County, which Judge Prado, you were on the panel on, the commissioner, this court held that a close timeline is enough to raise a causal connection and show, raise basically a fact issue for the jury. And in that case, there was a three-year timeline, but the court said you have to look at all the evidence in the context and so a timeline in and of itself can be enough to raise a fact issue. We have a lot more evidence than just the timeline, but that's one court case that held that a timeline is enough to at least get you past motivating factor. Then you look at the defense's reasons and in this case, the defense offers no reasons whatsoever for terminating him. What's your best articulation of how you have made at least a minimal showing on the causation issue to get you further? We know about the inconsistencies, which the district court declined to look. Is that what you rest firmly on? Because even in, I think, your client's position, he's not able to pinpoint time-wise exactly when this happened or whatever. So, I mean, what's the strongest articulation you can make that you're in a zone of causation or something, even in construing this in your favor? Yes. Yes, Your Honor. False testimony by the commissioner about why they were terminated. Absolutely false testimony. The budget documents don't support it and they had a budget surplus. Specific changing reasons as to why he terminated him. Assault, then not that, then performance reasons. No explanation whatsoever for why he terminated him. I don't know. There are otherwise at-will employees, right? That's absolutely correct. Which means you can fire somebody for no reason. That's right. That's right. But when you're asked, and when there's evidence here of causation, that they need to have, at least consider their response. If they say they have no reason, that's fine. But if there's other evidence of untrue testimony, timing, close circumstantial timing, another thing is a complete lack of documentation. The commissioner swore he terminated every single employee, had them submit applications, and then rehired all but these nine plaintiffs. No documentation of that whatsoever. It doesn't show up in their personnel files. There's no job applications. And the commissioner swore that that evidence should exist. And so, recent case of Burton v. Freescale, evidence that documentation should exist when it doesn't and that it's not there is also evidence to support causation. So that's also. I mentioned changing stories, mendacity. Again, he didn't tell the truth about not using. There's evidence raising a fact issue. He's not telling the truth about misusing county resources. He specifically said he didn't tell the truth about promoting someone into Del Bosque's position after he was terminated. He didn't tell the truth about never meeting with Morales before he was terminated. He also didn't tell the truth Morales, who replaced Del Bosque, had been suspended without pay for five days, approximately a year before, and had a serious performance issue. The commissioner was told about that, and yet the commissioner denied that he ever knew anything about it. Anita Hammond testified, I told him about that incident and his suspension right before he was terminated. What is your response, based on the record, to the fact that these persons, Hammond, Morales, and Montalvo, said they were never told about misuse of county property? I think it raises a fact issue. I think it is, these are all subordinates of the commissioner. They all wanted to keep their job, and it raises a fact issue. But give us the names of the persons who told them about the misuse of county property. So, Mr. Del Bosque, of course, told them about the misuse of county property, and he spoke to all of those. Mr. Gonzalez spoke to Mr. Morales, and he also spoke to Mr. Del Bosque about the misuse of county resources. This is what you gave us today. And that's what I gave you. The colored chart. Yes, sir. Yes, sir. And that's all reflected in the record and in our briefs. And Mr. Cano spoke with Ms. Hammond, and also spoke with HR Director Montalvo, and also Mr. Cano spoke with other county workers. In fact, in telling them, I think Edilio Del Bosque is going to the district attorney. He provided evidence that when he spoke with Mr., started talking out about it, that Mr. Morales started treating him differently, not assigning him to do colice. So, there's many people who knew that they were speaking out about this issue, and I think it raises a complete fact issue, and it's beyond credibility to say that the commissioner never knew about it. So, thank you. All right. Thank you, Mr. Smith. Thank you, Your Honors. Appreciate it. Thank you. So, Ms. Leeds, thank you both for the briefing. All right. We'll call the next case up.